Filed 11/7/16 Unmodified opinion attached

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF OCEANSIDE et al., <br><br> Defendants and Respondents; <br><br> S.D. MALKIN PROPERTIES, INC. <br><br> Real Party in Interest and Respondent. | D069561 <br><br><br> (Super. Ct. No. 37-2014-00039463-CU-WM-NC) <br><br><br> ORDER MODIFYING OPINION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT

It is ordered that the opinion filed herein on October 25, 2016 be modified as follows:

In the first sentence of the first full paragraph on page 13, the word "TOT" should be replaced with the word "total," so that the sentence now reads:

> The city's subsidy report states that the hotel developer will receive an estimated $13,688,267 in total subsidies.

There is no change in judgment.

McCONNELL, P. J.

Copies to: All parties

Filed 10/25/16 Unmodified version

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF OCEANSIDE et al.,<br><br>    Defendants and Respondents;<br><br>S.D. MALKIN PROPERTIES, INC.<br><br>    Real Party in Interest and Respondent. | D069561<br><br><br>(Super. Ct. No. 37-2014-00039463-CU-WM-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline M. Stern, Judge.  Affirmed.


Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim for Plaintiff and Appellant.

John P. Mullen, City Attorney, for Defendants and Respondents.

Seltzer Caplan McMahon Vitek and G. Scott Williams for Real Party in Interest and Respondent.

The record here demonstrates that in publishing its agenda with respect to its consideration of an agreement under which a developer would be paid a subsidy in the form of remission of $11 million for transient occupancy tax (TOT) collected from a luxury hotel the developer agreed to build, as well as other concessions, the city council of defendant and respondent City of Oceanside (the city)[1] met the requirements of the Brown Act (Gov. Code,[2] § 54950.5 et seq.).  Under the agreement, the city was initially obligated to pay the developer 100 percent of TOT receipts generated by the hotel and, thereafter, smaller percentages of TOT receipts from the hotel, until the city's $11 million TOT obligation had been satisfied.  When the agreement was presented to the city council for approval, the council agenda stated that the council would consider: the developer' s agreement to guarantee development of the subject property as "a full service resort"; an agreement "to provide a mechanism to share Transient Occupancy Tax (TOT) generated by the Project"; and a report, required by statute "documenting the amount of subsidy provided to the developer, the proposed start and end date of the subsidy, the public purpose of the subsidy."  As we explain more fully below, the language of the agenda, considered as a whole, gave the public and press more than a "clue" (see *Moreno v. City of King* (2005) 127 Cal.App.4th 17, 27 (*Moreno*)) the city planned to provide the project developer with a substantial and ongoing financial subsidy for the resort project.

---

[1]     Unless otherwise indicated, all references to the city also include defendants and respondents Oversight Board of the City of Oceanside Successor Agency and City of Oceanside Successor Agency

[2]     All further statutory references are to the Government Code, unless otherwise indicated.

Accordingly, the trial court did not err in finding the agenda met the requirements of the Brown Act.

We also find that the city's subsidy report study substantially complied with the separate provisions of section 53083. Thus, we affirm the trial court's judgment in favor of the city.

## FACTUAL AND PROCEDURAL BACKGROUND

A. City Council Adopts Resolution Approving Hotel Project

On July 22, 2014, the city's oversight board[3] passed a resolution approving the sale of certain city owned property to real party in interest and respondent S.D. Malkin Properties, Inc. (Malkin). The sale to Malkin was set forth in a "Disposition Agreement and Escrow Instructions" (Disposition Agreement). Under the terms of the Disposition Agreement, upon the closing date of the sale to Malkin, "a duly executed and acknowledged Agreement regarding Real Property (TOT) in the form of Exhibit 10.1.3" would be delivered to the escrow holder.

The "Agreement Regarding Real Property (TOT)" (TOT Agreement) is an agreement between the city and Malkin. For its part, Malkin agreed to develop, in two phases, a 360 room luxury hotel on land owned by the successor to the city's former

---

[3]     The city's oversight board was created under the terms of legislation that dissolved the city's redevelopment agency. (See Assem. Bill No. 1X 26 (2011-2012 1st Ex. Sess.).) The oversight board oversees the city's redevelopment successor agency in winding down the city's redevelopment program.

redevelopment agency;[4] the city agreed to pay Malkin a total subsidy of $11,335,250,[5] from TOT taxes generated by the hotel. Under the TOT Agreement, the hotel would be developed in two phases, and, for the first four years after each phase was complete, 100 percent of TOT's generated by each phase would be paid to Malkin. As we indicated, thereafter smaller percentages of TOT's generated by the hotel would be paid to Malkin.

The city council put the TOT Agreement, and items closely related to the hotel development, on its agenda for its September 10, 2014 meeting. The agenda with respect to these matters stated: "Adoption of a resolution to approve: 1. An Agreement Regarding Real Property (Use Restrictions) between the City of Oceanside and SD Malkin Properties Inc. to guarantee development and use of the property as a full service resort consistent with the entitlements for the project; 2. An Agreement Regarding Real Property to provide a mechanism to share Transit Occupancy Tax (TOT) generated by the Project; 3. A Grant of Easement to permit construction of a subterranean parking garage under Mission Avenue; and 4. A report required by AB 562 prepared by Paul Marra of Keyser Marston and Associates documenting the amount of subsidy provided to the developer, the proposed start and end date of the subsidy, the public purpose of the subsidy, the amount of tax revenue and jobs generated by the project; and 5. A License Agreement to permit construction staging for the project on a portion of Lot 26."

---

[4]     See footnote 3.

[5]     Under the agreement, the city's payment of the $11,335,250 obligations was calculated so that its nominal payments in the future would be discounted to their value at the time the agreement went into effect.

4

According to plaintiff and appellant San Diegans for Open Government (SDOG), there was no serious opposition to the hotel project at the city council meeting. At the meeting, the city council adopted a resolution approving the TOT Agreement and the subsidy report.

B. Trial Court Proceedings

SDOG filed an amended complaint for declaratory and injunctive relief and a petition for writ of mandate against the city on April 7, 2015. The complaint and petition alleged violations of the Brown Act, the subsidy reporting provisions of section 53803, and the California Constitution. The trial court heard the matter on the merits on October 23, 2015 and found in the city's favor. Thereafter, it entered judgment in favor of the city, and SDOG filed a timely notice of appeal.

On appeal, SDOG again asserts the city violated the Brown Act and section 53803.

DISCUSSION

I

A. The Brown Act

With respect to the Brown Act, we begin by noting that where, as is the case here, the facts are undisputed, we determine a local agency's compliance de novo. (*Castaic Lake Water Agency v. Newhall County Water Dist*. (2015) 238 Cal.App.4th 1196, 1204 (*Castaic*).) Importantly, we also recognize that an agency fulfills its agenda obligations under the Brown Act so long as it substantially complies with statutory requirements. (*Castaic*, at p. 1205; § 54960.1, subd. (d)(1).) " ' " 'Substantial compliance . . . means

5

actual compliance *in respect to the substance essential to every reasonable objective of the statute.' " ' "* (*Castaic*, at p. 1205, quoting *North Pacifica LLC v. California Coastal Com.* (2008) 166 Cal.App.4th 1416, 1431-1432.)

When the Legislature enacted the Brown Act, it declared that "the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. [¶] The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." (§ 54950; see stats. 1953, ch. 1588, § 1.) In order to fully protect the people's right to be informed, the Brown Act, by its terms, requires the agenda of a regular meeting of a local agency, such as the city council, be posted 72 hours before the meeting commences and contain "*a brief general description of each item of business to be transacted or discussed at the meeting, including items to be discussed in closed session. A brief general description need not exceed 20 words.*" (§ 54954.2, subd. (a), italics added.) Importantly, with exceptions not pertinent here, "[n]o action or discussion shall be undertaken on any item not appearing on the posted agenda." (*Id.*, subd. (b).)

Although there is not a great deal of direct authority with respect to what satisfies the Brown Act's requirement of a "brief general description" of items to be considered by a local agency, we can discern from the statute itself, cases discussing the statute as well

6

as closely related statutes, and other authority, a general principle that agenda drafters must give the public a fair chance to participate in matters of particular or general concern by providing the public with more than mere clues from which they must then guess or surmise the essential nature of the business to be considered by a local agency. Thus, in *Moreno*, *supra*, 127 Cal.App.4th 17, although a city was considering taking disciplinary action against its finance director, including possible termination, its agenda item was inadequate because it merely stated that in closed session the city would consider: " 'Per Government Code Section 54957: Public Employee (employment contract).' " (*Id*. at p. 21.) In finding this failed to give notice to either the public, or the finance director, that the council was considering disciplining or terminating him, the court stated: "It was undisputed that at least a quarter of the meeting was actually devoted to a discussion of [the finance director] and whether to terminate him . . . . The agenda's description provided no clue that the dismissal of a public employee would be discussed at the meeting." (*Id*. at pp. 26-27.) Importantly, the court went on to point out how easily the city council could have met the requirements of the Brown Act: "[A]n agenda that said simply 'Public Employee Dismissal' would have provided adequate public notice of a closed session at which the Council would consider [the finance director's] dismissal." (*Moreno*, at p. 27.)

Similarly, in applying analogous provisions of the Education Code, the court in *Carlson v. Paradise Unified Sch. Dist.* (1971) 18 Cal.App.3d 196, 200 (*Carlson*) found that an agenda which stated that a local board of education would consider a "[c]ontinuation school site change" did not permit the board to decide to close an

7

elementary school and move the continuation school to the site of the elementary school. The court stated: "[I]t is imperative that the agenda of the board's business be made public and in some detail so that the general public can ascertain the nature of such business. It is a well-known fact that public meetings of local governing bodies are sparsely attended by the public at large *unless* an issue vitally affecting their interests is to be heard. To alert the general public to such issues, adequate notice is a requisite. In the instant case, the school board's agenda contained as one item the language 'Continuation school site change.' This was entirely inadequate notice to a citizenry which may have been concerned over a school *closure*. [¶] On this point alone, we think the trial court was correct because the agenda item, though not deceitful, was entirely misleading and inadequate to show the whole scope of the board's intended plans. It would have taken relatively little effort to add to the agenda that this 'school site change' also included the discontinuance of elementary education at [one school] and the transfer of those students to [another school.]" (*Ibid*.)

The Attorney General reached a similar conclusion when asked to consider an agenda of the State Board of Food and Agriculture, which was subject to related provisions of the Bagley-Keen Open Meeting Act (§§ 11121-11121.8, 11123). An agenda for the board stated that the board would consider "Tuolumne River San Joaquin River Flood Control Problem"; however, in acting on that agenda item, the board adopted a resolution opposing congressional designation of the Tuolumne River as a "Wild and Scenic River." The Attorney General concluded that the agenda did not meet the requirements of the statute because members of the public would have to guess as to

8

whether they should attend the meeting of the board or seek additional information from the board. (67 Ops.Cal.Atty.Gen. 84 (1984).)

On the other hand, however, it is also clear that so long as notice of the essential nature of the matter an agency will consider has been disclosed in the agency's agenda, technical errors or immaterial omissions will not prevent an agency from acting. In *Castaic*, *supra*, 238 Cal.App.4th at pages 1206-1207, a water agency published an agenda which stated that its board of directors would conduct a conference with its legal counsel, in closed session, and "discuss potential litigation." The agenda erroneously cited section 54956.9, subdivision (c), which defines "litigation" as including any adjudicatory proceeding; the agenda should have cited section 54956.9, subdivision (d)(4), which, in particular, permits closed sessions when an agency is "deciding whether to initiate litigation." In finding that the agency's discussion of and decision to initiate litigation was valid and that it had substantially complied with the Brown Act, the court stated: "[Plaintiff's] argument is hypertechnical and elevates form over substance. The given notice plainly advised the members of the public that on March 14, 2013, [the board] would be meeting with legal counsel, in closed session, to discuss potential litigation in two cases. The citation in the given notice to subdivision (c) instead of subdivision (d)(4) of section 54956.9 could not possibly have misled or confused anyone." (*Castaic*, at p. 1207.)

B. Analysis

Here, we have little difficulty concluding the city substantially complied with the agenda requirements of the Brown Act. Its agenda for all the actions it would be

9

considering relating to the hotel project, including the disputed TOT Agreement, expressly gave the public notice that it would be considering a fairly substantial development of publicly owned property as a luxury hotel; that the city would be sharing TOT's generated by the project; and, importantly, by express reference to the subsidy report, that the project, if approved, would involve a subsidy by the city.  Admittedly, the agenda would have been *more* informative had it set forth the amount of the subsidy, its duration, and its source in TOT's generated by the project.  However, to date, the Legislature has not required such detail or precision in local agency agendas; rather, as noted, the statute only requires a "brief general description," which the cases in turn have determined only requires fair notice of the essential nature of what an agency will consider.  (See *Carlson*, *supra*, 18 Cal.App.3d at p. 200.)  Here, the city met this somewhat elastic standard by publishing an agenda that was not in any sense confusing, misleading or unfairly opaque and that gave the public fair notice of the essential nature of what the council would be considering.  (Compare *Moreno*, *supra*, 127 Cal.App.4th at p. 27 [inadequate notice of the substance] and *Castaic*, *supra*, 238 Cal.App.4th at pp. 1206-1207 [sufficient notice, albeit technically inaccurate].)

## II

On appeal, SDOG also argues the subsidy report considered by the city council was inadequate.  Like the trial court, we find the report substantially complies with the requirements of section 53083.

10

Section 53083<sup>6</sup>, as enacted in 2013, requires that before approving any economic

---

6    Section 53083 provides:

"(a)  On and after January 1, 2014, each local agency shall, before approving any economic development subsidy within its jurisdiction, provide all of the following information in written form available to the public, and through its Internet Web site, if applicable:

"(1)  The name and address of all corporations or any other business entities, except for sole proprietorships, that are the beneficiary of the economic development subsidy, if applicable.

"(2)  The start and end dates and schedule, if applicable, for the economic development subsidy.

"(3)  A description of the economic development subsidy, including the estimated total amount of the expenditure of public funds by, or of revenue lost to, the local agency as a result of the economic development subsidy.

"(4)  A statement of the public purposes for the economic development subsidy.

"(5)  Projected tax revenue to the local agency as a result of the economic development subsidy.

"(6)  Estimated number of jobs created by the economic development subsidy, broken down by full-time, part-time, and temporary positions.

"(b)  Before granting an economic development subsidy, each local agency shall provide public notice and a hearing regarding the economic development subsidy.  A public hearing and notice under this subdivision is not required if a hearing and notice regarding the economic development subsidy is otherwise required by law.

"(c)  The information required to be provided in subdivision (a) shall remain available to the public under existing state and federal law and be posted on the local agency's Internet Web site, if applicable, for the entire term of the economic development subsidy.

"(d)  The local agency, within the term of the economic development subsidy but not later than five years after the action granting an economic development subsidy, as defined in paragraph (1) of subdivision (g), shall issue a report for each economic development subsidy.  The report shall contain the information described in subdivision (a).  The local agency shall make the report available to the public and through its Internet Web site, if applicable. The report shall also contain the following information, if applicable:

"(1)  The name and address of all corporations or any other business entities, except for sole proprietorships, that are the beneficiary of the economic development subsidy, if applicable.

"(2)  The start and end dates and schedule for the economic development subsidy.

11

development subsidy, a local agency must provide the public with detailed information about the subsidy, including, the recipient, duration, amount and purpose of the subsidy; tax revenues expected as a result of the subsidy; and the estimated number of jobs created by the subsidy, broken down by "full-time, part-time, and temporary positions."

(§ 53083, subd. (a).) Although the statute does not itself permit substantial rather than

---

"(3) A description of the economic development subsidy, including the estimated total amount of the expenditure of public funds by, or of revenue lost to, the local agency as a result of the economic development subsidy.

"(4) The net tax revenue accruing to the local agency as a result of the economic development subsidy.

"(5) The net number of jobs created by the economic development subsidy, broken down by full-time, part-time, and temporary positions.

"(e)

"(1) The local agency, within the term of the economic development subsidy but no later than five years after the action granting an economic development subsidy, as defined in paragraph (1) of subdivision (g), shall hold a public hearing to consider any written or oral comments on the information contained in the report prepared pursuant to subdivision (d).

"(2) For an economic development subsidy, as defined in paragraph (1) of subdivision (g), with a term of 10 years or more, the local agency shall hold a public hearing at the conclusion of each economic development subsidy that shall contain the information described in subdivision (d), in written form available to the public, and through its Internet Web site, if applicable.

"(f) Each public hearing required by this section shall be consolidated with a local agency's regularly scheduled hearing.

"(g) As used in this section, the following terms have the following meanings:

"(1) 'Economic development subsidy' means any expenditure of public funds or loss of revenue to a local agency in the amount of one hundred thousand dollars ($100,000) or more, for the purpose of stimulating economic development within the jurisdiction of a local agency, including, but not limited to, bonds, grants, loans, loan guarantees, enterprise zone or empowerment zone incentives, fee waivers, land price subsidies, matching funds, tax abatements, tax exemptions, and tax credits. 'Economic development subsidy' shall not include expenditures of public funds by, or loss of revenue to, the local agency for the purpose of providing housing affordable to persons and families of low or moderate income, as defined in Section 50093 of the Health and Safety Code.

"(2) 'Local agency' means a city, including a charter city, county, or city and county."

12

strict compliance with its requirements, substantial compliance is presumed to satisfy the intent of the Legislature: " 'Unless the intent of a statute can only be served by demanding strict compliance with its terms, substantial compliance is the governing test.' " (*North Pacifica LLC v. California Coastal Com.*, *supra*, 166 Cal.App.4th at p. 1431.)

The city's subsidy report states that the hotel developer will receive an estimated $13,688,267 in TOT subsidies. This amount was calculated by estimating the annual TOT taxes generated by the hotel over a number of years and then discounting to present value the amount estimated for each future year.[7] Although the report itself does not make it entirely clear the discount calculation was applied to each annual estimated subsidy and that the present value of the total subsidy was the sum of each annual subsidy, as discounted, the report, by giving the public a good faith and reasonable estimate of the present value of the subsidy, substantially complied with the requirements of the statute.

We also reject SDOG's contention the subsidy report failed to accurately set forth the number of jobs attributable to the subsidy. SDOG's principle contention with respect to the jobs estimate is its contention the report inaccurately estimated the jobs attributable *to the project*, as opposed to jobs attributable *to the subsidy*. It is true, of course, that the statute by its terms requires an estimate of jobs attributable to the subsidy; however, where, as here, the agreement with a developer expressly requires the subsidy and is a

---

7       The report stated that the estimated total nominal amount of the subsidy—without application of any discount—would be $25,628,00.

13

condition of the developer's obligation to construct and operate the project, a report of jobs attributable to the project is a reasonable means of *estimating* the jobs attributable to the *subsidy*.

The subsidy report estimated the number of permanent full-time jobs, the number of permanent part-time jobs, and the number of temporary jobs. The report did not present an estimate of full-time and part-time temporary jobs, as SDOG argues it should have. As the city points out, the statute by its terms does not also require an estimate of full-time and part-time temporary jobs.

Finally, we reject SDOG's contention the statute requires that a local agency's estimate of jobs attributable to a subsidy calculate the number of jobs that might be *lost* as result of the subsidy by virtue of the competition the project represents with adjacent entrepreneurs. While, if possible, such a calculation might be helpful to the public in evaluating a project, we cannot read into the statute such a requirement.

DISPOSITION

The trial court's judgment is affirmed.  Respondents city and Malkin to recover their costs on appeal.


BENKE, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.