Filed 2/5/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| AMIRA Z. MANDERSON-SALEH, | D076652 |
| Plaintiff and Appellant, | |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | (Super. Ct. No. 37-2018-00017346-CU-BC-CTL) |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed in part and reversed in part.

David A. Kay for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton and Joanne Alnajjar Buser for Defendant and Respondent.


Amira Manderson-Saleh is the daughter of an oncology nurse (Mother) who worked at the University of California at San Diego (UCSD) for about 12 years until she retired shortly before her death.  Mother earned a pension under rules permitting the employee to designate a beneficiary to receive specified monthly pension benefits upon the employee's death.

When Manderson-Saleh claimed her rights as the designated beneficiary shortly after Mother's death, The Regents of the University of California (Regents) denied her claim, finding Mother did not properly identify Manderson-Saleh as the contingent beneficiary before her death. Thus, none of these earned pension benefits were paid, and instead they were retained by the Regents.

Manderson-Saleh filed a complaint against the Regents. In her amended pleading, she alleged breach of contract and alternatively sought a writ of mandate to overturn the Regents' decision. (Code Civ. Proc., § 1085.)[1] The Regents demurred only to the contract claim, and the court sustained the demurrer without leave to amend.

The court then conducted a separate proceeding on the section 1085 mandate petition. After evaluating the parties' written evidence, the court found Manderson-Saleh was not entitled to relief because the Regents had the right to strictly apply its rule that contingent-annuitant pension benefits are conditioned on the Regents receiving a signed beneficiary-election form before the employee's death, and the Regents received this form one week after Mother's death. The court rejected Manderson-Saleh's different interpretation of the rule and her arguments this rule was satisfied by the Regents receiving Mother's election worksheet before her death.

The court entered a final judgment sustaining the demurrer and denying the mandate petition. Manderson-Saleh challenges both rulings.

---

[1]    All unspecified statutory references are to the Code of Civil Procedure. We refer to "the Regents" in the singular based on its Constitutional designation as a single entity. (Cal. Const., art. IX, § 9, subd. (a); see *De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 580.)

We determine the court properly sustained the demurrer on the contract claim without leave to amend.  But we conclude the court erred in denying the mandate petition.  The undisputed evidence establishes Mother substantially complied with the Regents' pension rules and the Regents abused its discretion in failing to consider and apply the substantial compliance doctrine in evaluating Manderson-Saleh's claim.  We reverse and remand with directions for the superior court to grant the mandamus petition and to issue a writ ordering the Regents to grant Manderson-Saleh's contingent-annuitant pension claim.

FACTUAL AND PROCEDURAL SUMMARY

Manderson-Saleh appeals from two separate trial court orders. Because each order requires a different standard for evaluating the record and because the parties dispute the admissibility of portions of the record, we initially describe only those facts that are undisputed for purposes of this appeal.  In later sections, we will discuss additional facts relevant in the different procedural contexts and will resolve evidentiary disputes.

A.  *Summary of Background Facts*

In 2004, Mother began working at UCSD as an oncology nurse, and in 2014, she learned she had cancer but continued working.

On August 25, 2016, after learning her cancer had advanced and she would die soon, Mother contacted the Regents' retirement administration service center (Service Center) to initiate her retirement under the University of California Retirement Plan (Plan).  On this date, Mother (who was not married) gave her young adult daughter, Manderson-Saleh, a signed written notarized power of attorney, which was necessary because Mother was becoming increasingly unable to function because of her advanced cancer.  The Regents was aware of Mother's status, and accepted that

3

Manderson-Saleh could act on Mother's behalf pertaining to all future retirement and pension decisions.

About five days later, a Regents retirement representative emailed Mother information about how to request a Personal Retirement profile with a projected retirement-benefits estimate. This email included links to two documents on the Service Center's website: the Regents' Retirement Handbook (Handbook) and the Summary Plan Description for retirement benefits. The Handbook provides detailed information about the retirement process and benefits, including an explanation that after receiving the employee's information, the Service Center will provide a "personalized retirement election form which is the document you will sign to confirm your choices and finalize your decision to retire." The Handbook also states: "If you die before the . . . Service Center receives your retirement election form, your retirement election will not be effective and may affect any beneficiary payments."

About two weeks later, on September 11, Mother retired from her UCSD nursing job. The next day, the Service Center emailed Mother a blank Monthly Retirement Income Election Worksheet (Election Worksheet) to permit Mother to indicate how she wanted to receive her pension benefits and to designate a contingent annuitant beneficiary (the person entitled to receive specified portions of Mother's earned pension benefits upon her death). The Service Center had established a secure email with Manderson-Saleh to expedite Mother's elections because it was aware of Mother's impending death and the need to promptly formalize decisions. The Election Worksheet printed form states at the top: "Please return your entire worksheet as soon as possible so we may prepare your election documents for signature."

4

One or two days later, on about September 13, Manderson-Saleh, on Mother's behalf, faxed the Election Worksheet to the Service Center. This worksheet designated Manderson-Saleh as Mother's contingent annuitant beneficiary and identified Manderson-Saleh's birthdate. The Election Worksheet does not contain a signature line, and it was not signed. At that point, Manderson-Saleh (with the Service Center's knowledge and approval) was filling out the forms for Mother under her power of attorney because Mother's illness had incapacitated her.

A few days later, on Friday September 16, the Service Center (located in Oakland) mailed Mother (who lived in the San Diego area) a final "UBEN 161 Election" form for her to formally approve her final pension election decisions made in the Election Worksheet. The prepared form mailed to Mother contained the information from the Election Worksheet, including the designation of Manderson-Saleh as Mother's contingent beneficiary and Manderson-Saleh's birthdate. The form stated: "In signing and submitting this election document, I acknowledge and understand and agree that: [¶] . . . [¶] The election made on this form will not be effective if the form is received by the [Service Center] after the member's death."

It appears Mother may not have received this prepared UBEN 161 Election form before she died on September 20, and neither she nor Manderson-Saleh signed or returned this form before her death.

On the same date it mailed the UBEN 161 Election form, on September 16, the Service Center mailed or emailed a completed Personal Retirement Profile to Mother, which contained a reference to the UBEN 161 Election form and stated that the form must be submitted to finalize pension elections before the member's death.

Six days after Mother's death, on September 26, the Service Center received a faxed UBEN 161 Election form signed by Manderson-Saleh (on behalf of Mother) with a date of September 26.

The next month, on October 12, the Service Center wrote to Manderson-Saleh, acknowledging Mother's September 20 death, and stating that "since [it] received the UBEN 161 after September 20, 2016, we are unable to move forward with your mother's retirement."

Several months later, Manderson-Saleh's then attorney (Joseph Foley) wrote to the Service Center challenging its decision to deny Manderson-Saleh's beneficiary claim. In the letter, Foley claimed that Manderson-Saleh had signed the UBEN 161 Election form on September 16, but had inadvertently misdated it as September 26. Foley also stated:

> "Moreover, [Manderson-Saleh], as attorney in fact, was in contact with [the Service Center] on several occasions from September 12, 2016 through September 19, 201[6], both by email and by telephone asking questions about the retirement packet paperwork and advising the . . . representative of [Mother's] elections designated in the paperwork. [Manderson-Saleh] was assured on more than one occasion by [Service Center] representatives that [Mother's] elections designated on the paperwork, prior to September 20, 201[6], were sufficient to effectuate her retirement elections.

> "It is clear from the background and circumstances of this matter that [Mother] took an active role in completing the . . . Retirement Packet prior to her passing thereby memorializing her clear wishes and intent known. [Service Center] representatives were actually contacted by [Manderson-Saleh] as Attorney in Fact for [Mother], expressing [Mother's] wishes regarding her pension benefit elections. [Service Center representatives were] well aware of [Mother's] elections regarding her pension beneficiary prior to September 20, 2016."

6

Foley requested that the Service Center accept and process Mother's retirement packet designating Manderson-Saleh as the pension beneficiary.

Three months later, the Regents' Plan Administrator denied this request. The denial letter stated in part:

> "I have reviewed your appeal of the denial of your request for Contingent Annuitant benefits. [A]fter careful consideration of the facts and circumstances surrounding the communications regarding those benefits, I find no basis for reversing the denial. [¶] . . . [¶]
>
> "The rules regarding Elections and Designations are contained in the [Plan] Regulations section 12.03, which states that an election or designation of Beneficiary or Contingent Annuitant is effective only if the benefit election form or designation of Beneficiary or Contingent Annuitant is received by the Plan Administrator prior to the Member's date of death and is subsequently approved as complete by the Plan Administrator. It is also stated on the [UBEN 161 Election form] that the form must be received prior to the member's death. Since the election form was not received until after [Mother's] death, it is not effective.
>
> "In addition, the election form is signed by [Mother's] attorney-in-fact, and is dated 6 days after her death. Since Powers of Attorney typically expire upon the death of the principal, the Power of Attorney (granting Manderson-Saleh authority to conduct retirement transactions for [Mother]) was no longer valid at the time the form was signed on September 26, 2016. [¶] This decision regarding your appeal is final . . . ."

The Plan Administrator's determination was pursuant to the Regents' Claims Review Procedure, section 11.07, which requires a "full and fair review" of pension benefit challenges, including a review of the "written materials submitted by the applicant or the University."

7

B. *Manderson-Saleh's Superior Court Pleadings*

In April 2018, Manderson-Saleh, represented by a different attorney (Gastone Bebi), filed a complaint alleging four causes of action: (1) breach of contract; (2) breach of fiduciary duty and the duty of good faith and fair dealing; (3) equitable estoppel; and (4) negligent misrepresentation.

The Regents demurred to the complaint mainly on the basis that the claims were barred because Manderson-Saleh's exclusive remedy was to petition for a writ of mandate.

Before the court ruled on the demurrer, Manderson-Saleh filed a first amended complaint alleging a single cause of action for breach of contract, and in the alternative, petitioned for a section 1085 writ of mandate to overturn the Regents' decision.

On her contract claim, Manderson-Saleh alleged Mother was contractually entitled to retirement benefits under the Plan, including the right to name a contingent annuitant to receive benefits upon her death, and Manderson-Saleh had the right to enforce the contract as an intended beneficiary. She alleged she communicated with Service Center representatives from September 12 through September 19, explaining that Mother's "condition was rapidly deteriorating" and "[t]he representative then offered to send a secured email with the [Election Worksheet] form" so Mother could express her wishes and "guarantee the election as soon as possible," and that the worksheet form was faxed back to the Regents on September 13 when Mother was still alive.

In her writ petition, Manderson-Saleh alleged that if her contract claim is not "an available remedy," she is entitled to a writ of mandamus overturning the Regents' decision. Among her mandate allegations were that

8

she was denied a fair hearing, and the Regents abused its discretion in considering the relevant evidence and/or in applying the applicable law.

### C. *Regents' Demurrer*

The Regents filed a demurrer only to the contract claim. The Regents argued this claim was barred because Manderson-Saleh's sole means of obtaining relief is through a mandamus remedy. The Regents also argued the contract claim had no merit because (1) Mother's employment was "by statute not contract"; (2) Manderson-Saleh was not a third party beneficiary; and (3) Mother failed to comply with the conditions precedent by failing to timely submit the signed UBEN 161 Election form before her death.

On the last argument, the Regents relied on Plan Regulation 12.03, which states in relevant part:

> "Every election for a Plan benefit, every election for a benefit payment option, and every designation of a Beneficiary or Contingent Annuitant which a Member is required or permitted to make shall be in accordance with procedures established and approved by the Plan Administrator. *Such election or designation shall become effective only if the benefit election form and/or the designation of Beneficiary or Contingent Annuitant is received by the Plan Administrator prior to the Member's date of death and is subsequently approved as complete by the Plan Administrator.*"[2] (Italics added.)

---

[2] The Regents also relied on a similar rule (Plan Regulation 4.08) stating: "If a Member . . . submits an election form for Retirement Income, . . . but dies prior to the distribution of the elected benefit, the election will be honored as long as the election form was received by the Plan Administrator prior to the Member's date of death and provided the election is subsequently approved as complete by the Plan Administrator. If the election form was not timely received or correctly completed, or was not approved by the Plan Administrator, the election form will not be honored."

9

In opposing the demurrer, Manderson-Saleh argued that a public employee's compensation, including a pension, imposes a contractual obligation on the public entity, and the employee's beneficiary can enforce those rights through a contract claim under a third party beneficiary theory. She also asserted that Plan Regulation 12.03 does not require receipt of a formal, signed beneficiary designation before the employee's death, and in any event, in California "a party is deemed to have substantially complied with an obligation . . . where any deviation [was] 'unintentional and so minor or trivial as not "substantially to defeat the object which the parties intend to accomplish." ' "

The court sustained the demurrer without leave to amend. The court reasoned that Manderson-Saleh's failure to comply with the condition that the UBEN 161 Election form be returned before Mother's death "was fatal to" her contract claim and to the related third party beneficiary theory. The court denied Manderson-Saleh's request for leave to amend.

The court then conducted a status conference for the merits hearing on Manderson-Saleh's writ of mandate petition. The parties apparently agreed the petition would be decided based on a written record.

D. *Writ Petition*

Manderson-Saleh's counsel then filed a memorandum of points and authorities supporting her section 1085 mandate petition. Manderson-Saleh argued that she (on Mother's behalf) met the requirements for designating a contingent annuitant because she faxed the Election Worksheet form to the Regents on or about September 13, 2016; the Election Worksheet identified her as the contingent annuitant beneficiary; and she had been assured by the Service Center representatives that nothing further was required to make the election effective. In support, she submitted her own declaration and the

10

declaration of her former partner (Albert Arellano) who assisted her in communicating with the Service Center.

Manderson-Saleh's declaration stated in part:

> "I feel that it is important for the court to understand the emotional turmoil and dire circumstances that my mother and I faced when she was asked to make 'election' decisions regarding her pension rights.

> "My mother and I had an extremely close relationship. [S]he was everything to me; mother, sister, friend, and mentor and I was all those things to her. As two only children, we held each other up and lived a close life. [¶] . . . [¶]

> ". . . I witnessed my mother's resolve to be pragmatic and unemotional towards her [cancer] diagnosis. As a caregiver herself she was in denial and did not prioritize getting her financial affairs in order. It was as if she isolated the inconvenience of stage 4 lung cancer and continued to work for the better part of a year and a half of her two-year fight. My mom worked until 7 months before she died because she said her patients still needed her. She hid her pain and we were happy to live in a bubble of hope. [¶] . . . [¶]

> "[In June 2016], she was admitted to the hospital and started to deteriorate and could no longer walk as her cancer metastasized to the bone. She was offered occupational therapy and chemo treatment options . . . and we did not see this as the beginning of the end, but rather a new element in the fight. Hindsight is much clearer. We discovered months later she [would not recover].

> "Recognizing in August 2016 that the fight . . . was taking a tremendous toll on her I obtained power of attorney . . . . In her rapid decline, I was left to manage filing for her disability, lawyers, notaries, and filing and sorting through paperwork to gain power of attorney . . . all while caring for her. . . . I was left to choose a hospice agency and during this time it was explained to me that she could be kept on

11

life support while we sort her affairs.  Mom was last discharged from the hospital on 9/7/16. . . .

"On 9/12/16 Albert Arellano, my then partner of 7 years, spoke with a . . . Service Center . . . representative about my mother's declining circumstances and expressed our preference to only use life support to sustain her life while we sorted her affairs as a very last resort . . . . Understanding this, in humanity, the [Service Center] representative forwarded a secured e-mail containing the [Election Worksheet form] . . . which enabled my mother to make the election for [her] retirement package electing me as her beneficiary. . . .  The representative did not state that the form I faxed would not be enough to secure the election, the intent was clearly to allow me to make an election in haste.  I believed that all the information [faxed] on 9/13/2016 was all that was required to make the election.

"I do not know when the official UBEN 161 [Election] form arrived because I was providing around the clock care for my immobile mother dying of stage 4 lung cancer; turning her every 2-3 hours even in the night, for weeks, changing her sheets with her in the bed, giving her shots, crushing pills, feeding her, and changing her diaper.  The hospice bathed her for me.  Everything else was performed by me . . . knowing I would have to say goodbye soon.  I was not checking the mail as closely as I should have, feeling as if I had settled her affairs.

"After her death on 9/20/16 . . . I then had to gather myself and plan her services.  When I was first able to emotionally check the mail, I first noticed and received what I now know to be the Official UBEN 161 form.  [¶]  On September 26 . . . I . . . faxed the form UBEN 161 to the [Service Center].  [¶] . . . [¶]

"I was never told [when the UBEN 161 Election form needed to be returned]. . . .  If I had been so advised, measures would have been taken to insure that my mother's wishes regarding [her] retirement benefits would be honored.  [M]y mother was on life support at the time

12

which could have been extended while the process was completed. . . . I would have expedited presentation of whatever forms were necessary if I had been advised that certain forms had to be received and the claim would be denied if all forms were not submitted prior to my mother's death. [¶] . . . [¶]

"My mother . . . had no other family besides myself. It was her expressed desire that I receive the pension benefits she worked for, contributed to and elected for me to receive. . . . I am no longer with my [former] partner . . . ."

Manderson-Saleh attached a copy of the Election Worksheet emailed to her on September 12, and the completed Election Worksheet naming herself as Mother's contingent beneficiary (with her birthdate and social security number) faxed to the Service Center on September 13. She also attached a "Transmission Verification Report" dated September 13, 2016, showing an 11-page fax was sent to the Service Center's fax number on September 13 at 2:25 p.m.

She also submitted Arellano's declaration, who stated in part:

"On 9/12/16 I spoke to a [Service Center] representative to notify them that [Mother's] health was declining rapidly . . . and that we needed to make an election for her today, in case things didn't improve. The representative then informed me that she would be providing us with a secure email where we could make an election and fax it back to them. I [asked] . . . if there was anything else that we need[ed] to comply with, she said no that as soon as they received the secured email with our election . . . that would be all they need[ed] to secure our election. I was assured by the representative that nothing further would be required. The next day on 9/13/2016 the election was faxed. I'm aware that the representative might have misspoken but with all due respect, [Manderson-Saleh] and I have always complied with everything from her mother's retirement to medical leave and always on time.

13

"If the representative would have been clear that we need[ed] to wait for a reiterated version of the election UBEN 161 form to sign, we would have complied.

"[Manderson-Saleh] has no relatives left, it has always been just her and her mother . . . . [Mother] stated to me that she was happy that all her hard work as a nurse would at least leave her daughter with some funds for her future. [¶] I have no financial interest in the outcome of this litigation . . . ."

Manderson-Saleh also argued Plan Regulation 12.03 is ambiguous and could be read as providing only a "benefit election" (and not the "Contingent Annuitant" designation) must be made on a signed benefit election form before the member's death.

E. *Regents' Response to Writ Petition*

The Regents' primary response was that its Plan Administrator properly denied the claim because it was entitled to strictly enforce Plan Regulation 12.03, which it said unambiguously requires that the Regents receive the signed UBEN 161 Election form no later than the day of the plan member's death and Manderson-Saleh admits the form was not sent or signed until after Mother's death. The Regents submitted an administrative record consisting of various Plan documents referred to above, except it did not include the completed Election Worksheet form that Manderson-Saleh and Arellano said was faxed to the Service Center on September 13.[3]

---

[3] The administrative record consisted of: (1) the September 16 Completed Personal Retirement Profile; (2) the Service Center's September 16 letter enclosing the final UBEN 161 Election form; (3) Mother's notarized Power of Attorney; (4) the death notification; (5) the UBEN 161 Election form signed by Manderson-Saleh on September 26; (6) the Regents' October 12 denial letter; (7) Manderson-Saleh's counsel's February 2017 letter; and (8) the May 2017 Plan Administrator's letter upholding the denial of the contingent annuitant benefits.

14

The Regents asserted evidentiary objections to the declarations of Manderson-Saleh and Arellano (and the attached Election Worksheet form), arguing a court cannot consider evidence beyond the administrative record. But the Regents submitted its own extra-record evidence: a declaration of a Service Center manager (Gregory Ricks), who said that based on his review of the Service Center database, he "can confirm" the "pertinent points of contact" between the Service Center and Mother (or her representative), and described the dates of those contacts (summarized in Part A above). Ricks also acknowledged that on September 14, 2016, *Mother "or her representative returned the . . . Election Worksheet to* [*the Service Center*]." (Italics added.) Ricks attached several documents to his declaration, including the Retirement Profile form prepared by the Service Center on September 16, containing information from the returned Election Worksheet form that identified Manderson-Saleh as Mother's contingent beneficiary.

Although Ricks admitted the Regents received the Election Worksheet before Mother's death and that this worksheet identified Manderson-Saleh as the contingent beneficiary, the Regents objected to the Election Worksheet document attached to Manderson-Saleh's declaration.[4] The Regents also argued that even if it had received the Election Worksheet attached to Manderson-Saleh's declaration, the unsigned worksheet was not a valid substitute for the UBEN 161 Election form, noting the printed worksheet stated it should be returned "as soon as possible so we may prepare your election documents for signature," and that other documents provided to

---

[4] The Regents did not explain the claimed difference between this document and the Election Worksheet it admits receiving before Mother's death.

15

Mother distinguished between the Election Worksheet and the UBEN 161 Election form.

The Regents additionally argued it was entitled to deny Manderson-Saleh's claim because she did not satisfy Plan Regulation 12.03's second condition to obtaining benefits—that the election was "subsequently approved as complete by the Plan Administrator."

The Regents maintained the equitable estoppel doctrine was inapplicable because it had notified Manderson-Saleh of the requirement it must receive the UBEN 161 Election form before Mother's death, including in (1) the UBEN 161 Election form and the cover letter, each mailed to Mother on September 16; (2) the Personal Retirement Profile mailed or emailed to Mother on September 16; (3) the Retirement Handbook; and (4) the Election Worksheet.[5]

The Regents also argued it cannot be held liable for any employee representations that differed from its written materials, relying on Government Code section 818.8 and provisions in its Plan documents and Retirement Handbook stating that any such representations are unauthorized, null, and void. The Regents also noted that when asserting equitable estoppel against a public entity, the moving party must establish "the 'avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest.' " The Regents argued any "theoretical

---

[5]    The September 16 mailed UBEN 161 Election form and cover letter said: "IMPORTANT NOTE: A member's election will not be effective if the election is received by the [Service Center] after the member's death" and "The election made on this form will not be effective if the form is received by the [Service Center] after the member's death." The Retirement Handbook and the Election Worksheet form contained statements referring to a separate document that needed to be signed for final election decisions.

16

injustice" to Manderson-Saleh would not warrant making an exception under the circumstances.

The Regents also relied on Ricks's additional statement in his declaration that: "In my review of the database tool related to communications about [Mother], there was no entry reflecting that any [Service Center] representative told [Mother] or her representatives that the . . . Election Worksheet would be sufficient on its own to confirm pension election benefits. [¶] The Regents employs over 75,000 employees across California and, to administer a pension plan such as the [Plan], The Regents must be able to continue its efforts to apply statutory requirements consistently to all members."

The Regents argued it was important that it adhere to its strict policy requiring a signed UBEN 161 Election form because "[t]he Plan Administrator would have no certainty that the [Plan] member intended for the member's hard-earned pension benefits to be paid to someone other than the [Plan] member . . . [and it] needs to hold someone accountable for the accuracy of the information on the UBEN 161 Election form, which is signed under penalty of perjury, in the event of any dispute."

F. *Manderson-Saleh's Reply*

In reply, Manderson-Saleh relied on *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 (*Western States*) to support the admissibility of the submitted declarations and attached Election Worksheet form. As to equitable estoppel, Manderson-Saleh argued the Regents' reliance on statements in the UBEN 161 Election form and the Personal Retirement Profile was misplaced because Manderson-Saleh did not receive these documents until after Mother's death.

17

To counter the Regents' factual assertions, Manderson-Saleh submitted reply declarations from Arellano and herself. Arellano said in part:

> "When I spoke to [Service Center] representative on 9/12/16 I made it very clear that we were concerned that [Mother] might pass away at any moment. This is the reason we established the secure-[e]mail for the rapid transmission of documents. I specifically stated that we could not rely on regular mail, as time was of the essence. It is my recollection that my conversations may have been recorded. If the conversations were recorded, the Regents could provide the recordings so that there is no dispute as to what was said . . . .

> ". . . The . . . UBEN form was mailed . . . [on September 16, which] . . . was a Friday. The [Service Center] . . . is in Oakland California. The form was not received before [Mother's] passing on 9/20/2016, the following Tuesday. If I had received it on the 20th, before [Mother] passed, it would have been signed and fax returned that same day. [¶] . . . [¶]

> ". . . I am the person who caused the fax to be sent on September 13, 2016. I sent the fax, from a FedEx office . . . ."

In her declaration, Manderson-Saleh reiterated she understood the Service Center would deliver "all necessary forms . . . via the secure email . . . because of the urgency of the situation and that regular mail would not be used to deliver important time sensitive documents to us."

## G. *Court's Ruling*

After considering the parties' briefs and the submitted materials, the court denied the writ petition, and issued a written order explaining its decision. The court first granted the Regents' motion for judicial notice of the proffered Plan regulations, sections of the Plan document, excerpts from the Handbook, and an excerpt from the Plan Description. The court then sustained the Regents' objection to Manderson-Saleh's evidence that was

beyond the Regents' administrative record, noting Manderson-Saleh could have submitted the Election Worksheet fax in the administrative proceedings, and, in any event, this evidence would not change its legal conclusion.

On the merits, the court found the Regents acted within its authority in interpreting Plan Regulation 12.03 to mean it must receive a signed UBEN 161 Election form before a Plan member's death for the contingent beneficiary election to be effective, reasoning that an administrative agency has " 'considerable deference' " in construing its own regulations. The court said that "even if it had . . . considered" the faxed Election Worksheet, the worksheet "would not satisfy this condition because it was not a signed form . . . as described in the Retirement Handbook." The court found the "Regents ha[s] a compelling reason to strictly follow [its] own regulations," noting it "employ[s] over 75,000 employees across California, and . . . mak[ing] an exception here . . . would undermine the regulations which exist for predictability and to benefit all plan participants."

The court also rejected Manderson-Saleh's argument that she was entitled to rely on representations made by Service Center representatives under the equitable estoppel doctrine, stating:

> "[Manderson-Saleh] does not know the identity of the representative that Mr. Arellano spoke with on the phone who made the alleged misrepresentation that nothing more was needed to designate the contingent annuitant. However, [the Regents] provides multiple examples of instances where [Manderson-Saleh] was put on notice as to the requirement of the signed UBEN 161 form. Indeed, the mailed September 16 letter enclosing the UBEN 161 form states on its face that it is the 'final retirement election document' for review and signature. [Manderson-Saleh] has not proven that [the Regents] intended that their

19

conduct should be acted upon, or acted so that [she] had a right to believe it was so intended."

The court entered judgment in the Regents' favor. The judgment included the court's rulings sustaining the demurrer as to the breach of contract claim without leave to amend, and finding against Manderson-Saleh on her mandate petition.

## DISCUSSION

### I. *Writ Petition*

#### A. *General Principles and Review Standards*

The parties agree Manderson-Saleh's writ petition was properly brought under section 1085, which is used to review administrative decisions that do not meet the requirements for review under section 1094.5. (See *Martis Camp Community Association v. County of Placer* (2020) 53 Cal.App.5th 569, 593-594 (*Martis Camp*); *Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848 (*Bunnett*).) One of the requirements for review under section 1094.5 is that "a hearing is required to be given." (§ 1094.5, subd. (a).) The parties agree that a hearing was not required to be given within the meaning of section 1094.5.

Mandamus under section 1085 is used to compel a ministerial duty or to correct an abuse of discretion. (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547 (*American Board*).) To establish entitlement to relief, the moving party must demonstrate the agency's "action was arbitrary, capricious or entirely without evidentiary support, [and/or that] it failed to conform to procedures required by law." (*People for Ethical Operation of Prosecutors and Law Enforcement v. Spitzer* (2020) 53 Cal.App.5th 391, 407 (*Ethical Operation*); see *Association of Irritated Residents v. San Joaquin Valley Unified Air Pollution Control Dist.* (2008) 168 Cal.App.4th 535, 542 (*Irritated Residents*).)

20

The trial court conducts a highly deferential review on these issues. (*Martis Camp, supra,* 53 Cal.App.5th at p. 594.) It may not substitute its judgment for that of the agency or force the agency to exercise its discretion in a certain way. (*Ibid.*; *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786 (*McGill).*)

But a mandate " 'will lie to correct abuses of discretion.' " (*Ethical Operation, supra,* 53 Cal.App.5th at p. 407; *Helena F. v. West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799.) An abuse of discretion occurs if an agency did not apply or properly interpret the governing law or consider all relevant factors, or if there was no rational connection between the relevant factors, the choice made, and the purposes of the enabling statute or regulation. (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212; *American Board, supra,* 162 Cal.App.4th at pp. 547-548.)

Under section 1085 and the Regents' internal rules, the trial court was required to apply a substantial evidence test to the Plan Administrator's factual findings.[6] (*Martis Camp, supra,* 53 Cal.App.5th at pp. 593, 596; *McGill, supra,* 44 Cal.App.4th at p. 1786; *Bunnett, supra,* 35 Cal.App.4th at p. 849; *Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 745.) We assess the court's factual findings under the substantial evidence standard, but exercise independent judgment on legal issues. (*Rivero v. Lake County Bd. of Supervisors* (2014) 232 Cal.App.4th 1187, 1193-1194; *Klajic v.*

---

[6] In the court below, Manderson-Saleh argued the trial court was required to reweigh the evidence and apply its own independent review in determining the foundational facts. On appeal, Manderson-Saleh does not reassert the independent review standard or suggest error on this issue. (See *Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1483-1489 (*Do*).)

*Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 996-997.) Legal issues include the interpretation of the governing statute or regulation and whether the agency took into account the relevant factors and acted "consistent with applicable law." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361; *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 233 ["[i]n a mandamus proceeding the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law"]; see *Martis Camp,* at p. 596; *Irritated Residents, supra,* 168 Cal.App.4th at pp. 543-549; *San Diegans for Open Government v. City of San Diego* (2016) 245 Cal.App.4th 736, 740-741.)

### B. *Evidentiary Record*

Before applying these mandamus principles, we consider the Regents' objection to Manderson-Saleh's proffered declarations and the faxed September 13 Election Worksheet form. As discussed, we conclude this evidence was admissible to explain the context of the parties' communications and course of actions. Because we do not reach the estoppel issues, we do not consider whether the evidence would be relevant on those matters.

### 1. *Legal Principles*

Generally, on a *section 1094.5* review after an administrative hearing, the court is limited to the evidence presented in the administrative proceedings unless the evidence was unavailable at the time of the hearing or improperly excluded from the record. (See *Metropolitan Water District of Southern California v. Winograd* (2018) 24 Cal.App.5th 881, 897; see also *Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733, 766, fn. 22.)

But a different standard applies to a *section 1085* review of a quasi-judicial administrative decision. (*Western States, supra,* 9 Cal.4th at pp. 568-

22

569, 575-576.) The general rule is that parties can introduce evidence outside the administrative record. (*Id.* at p. 576; Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2020) ¶ 20:65.) This rule reflects the notion that in these types of proceedings, there will often not be a fully developed administrative record or a formal process for receiving evidence. (*Western States,* at pp. 575-576; see *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 255 ["[a]dministrative actions that do not involve public hearings . . . are generally considered 'informal' "].)

In *Western States*, the California Supreme Court addressed whether this general rule should apply when a plaintiff brings a section 1085 writ petition to challenge a *quasi-legislative* administrative decision (a CEQA ruling), rather than a quasi-judicial administrative decision. (*Western States, supra,* 9 Cal.4th at pp. 575-576.) The court concluded such an extension was not warranted. (*Ibid.*) The court held "extra-record evidence is generally not admissible in [section 1085] actions challenging quasi-legislative administrative decisions . . . . *However, we will continue to allow admission of extra-record evidence in [section 1085] mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute.*" (*Id.* at p. 576, italics added.)

The high court recognized, however, that with respect to its rule prohibiting evidence in section 1085 mandate actions challenging a quasi-legislative decision, there may be exceptions "under unusual circumstances or for very limited purposes," including " 'for background information . . . or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.' " (*Western States, supra,* 9 Cal.4th at pp. 578-579; see *Santa*

23

*Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1103; *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 251.) But the court made clear these exceptions do not apply when the evidence is submitted "merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision." (*Western States,* at p. 579.)

### 2. *Analysis*

Manderson-Saleh is challenging a quasi-judicial administrative determination resulting from an informal decisionmaking process rather than a traditional hearing. Thus, under *Western States,* she was permitted to submit additional evidence to support her contention the Regents abused its discretion in considering her claim. Although the applicable rules permitted Manderson-Saleh to submit evidence, this procedure—an informal review by the Plan Administrator—was not the type of proceeding at which a party is expected to submit a full evidentiary record. Under the rules, the Plan Administrator had no obligation to identify the facts upon which he was relying before making his decision or to provide Manderson-Saleh with an opportunity to rebut any such facts. Further, Manderson-Saleh could reasonably have expected that the Plan Administrator would have access to much of the information provided in her declarations, including her contacts with the Service Center representatives and the faxed Election Worksheet form (the Regents *admits* it received the worksheet before Mother's death, but for unspecified reasons it was not part of the administrative record or attached to Ricks's declaration).

In arguing the court properly excluded this evidence, the Regents relies on *Cinema West, LLC v. Baker* (2017) 13 Cal.App.5th 194 and *Golden Drugs*

24

*Co., Inc. v. Maxwell-Jolly* (2009) 179 Cal.App.4th 1455 (*Golden Drugs*). *Cinema West* is inapposite because the petitioner was challenging a " 'quasi-legislative' " decision by an agency director (*Cinema West,* at p. 206), and thus was squarely governed by *Western States*'s holding.

*Golden Drugs* arose from a section 1085 proceeding, but is materially distinguishable because in that case the administrative hearing (pertaining to an agency revoking a pharmacist's license) was more extensive (although similarly "on paper") and the petitioner's new evidence included declarations that *directly contradicted* the agency's factual findings. (*Golden Drugs, supra,* 179 Cal.App.4th at pp. 1460-1465, 1467-1470.) Here, the extra-record evidence did not contradict or seek to rebut the Regents' dispositive finding that the UBEN 161 Election form was received after Mother's death. Manderson-Saleh conceded this fact. Rather, the evidence was relevant to show the nature of the communications between the Service Center and Manderson-Saleh, and to explain the background and context of those communications.

These facts were admissible under *Western States* because the facts were helpful to understand whether the Regents considered all relevant factors, correctly applied the rules (including the substantial compliance rule), and had in fact received information (the Election Worksheet form) that was not contained in the administrative record. The Regents essentially acknowledged the relevance of the course-of-conduct information by submitting its own extra-record evidence (Ricks's declaration) explaining the chronology of the relevant events, and by relying on his declaration to support its arguments.

On this record, Manderson-Saleh's proffered declarations and the attached September 13 fax were admissible to explain the course of conduct

between the Service Center and Manderson-Saleh, and whether the Plan Administrator considered all relevant information in reaching his conclusion. (See *Western States*, *supra*, 9 Cal.4th at pp. 578-579.) The court's refusal to consider this evidence, however, does not alone constitute prejudicial error because the court said it would reach the same conclusions even if it had considered the evidence. Thus, we must consider the issues on their merits.

C. *Analysis*

1. *Plan Regulation 12.03*

Manderson-Saleh contends the trial court and the Regents erred in interpreting Plan Regulation 12.03 to mean a mandatory precondition to obtaining contingent annuitant benefits is that the Regents receive a UBEN 161 Election form before the member's death.

Plan Regulation 12.03 provides:

> "Every election for a Plan benefit, every election for a benefit payment option, and every designation of a Beneficiary or Contingent Annuitant which a Member is required or permitted to make shall be in accordance with procedures established and approved by the Plan Administrator. *Such election or designation shall become effective only if the benefit election form and/or the designation of Beneficiary or Contingent Annuitant is received by the Plan Administrator prior to the Member's date of death and is subsequently approved as complete by the Plan Administrator.*" (Italics added.)

The Regents interpret this rule to mean a beneficiary designation is enforceable only if it receives a signed UBEN 161 Election form identifying the contingent beneficiary before the member's death.

Manderson-Saleh challenges this interpretation. She notes that the rule does not refer to a specific form or a required signature, and emphasizes the undisputed evidence the Regents had actual knowledge before Mother's death that Manderson-Saleh was the designated contingent annuitant based

26

on the Regents' acknowledged receipt of the Election Worksheet on September 14.[7]  She also argues the portion of the sentence referring to both the "benefit election form *and/or* the designation of Beneficiary or Contingent Annuitant" is ambiguous and can be reasonably read to mean the contingent-annuitant "[d]esignation" need not be on the "benefit election form" and can be communicated separately from the form.  (Italics added.)

Generally, the interpretation of a regulation " 'is . . . a question of law' and is . . . subject to . . . de novo review." (*Department of Industrial Relations v. Occupational Safety & Health Appeals Bd.* (2018) 26 Cal.App.5th 93, 100.) However, a reviewing court accords an administrative agency's interpretation of its own regulation great weight and deference, unless the interpretation is unauthorized or clearly erroneous.  (*Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639, 645; *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28.) This rule recognizes that an "agency has developed a level of 'expertise' in light of its familiarity with the legal and regulatory issues."  (See *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1272.) Courts are particularly deferential of the Regents' determinations because of its role as a state constitutional entity.  (*Ibid.*; see *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 889-890.)  Thus, although we are not bound by the Regents' interpretation, we give it great weight under the circumstances.  (See *Yamaha Corp. of America v. State Bd. of*

---

7    This evidence consisted of Ricks' declaration that the Regents received the completed Election Worksheet form on September 14, and the fact that the Service Center sent Manderson-Saleh the UBEN 161 Election form on September 16 that contained her name as the contingent beneficiary.

*Equalization* (1998) 19 Cal.4th 1, 12; *Byrd v. California State Personnel Board* (2019) 36 Cal.App.5th 899, 907-908.)

Under these principles, we find the Regents' interpretation to be reasonable, particularly when construing the requirement in light of the first sentence of Regulation 12.03, which provides that "Every election for a Plan benefit, every election for a benefit payment option, and every designation of a Beneficiary or Contingent Annuitant . . . shall be in accordance with procedures established and approved by the Plan Administrator." Those procedures as set forth in the Retirement Handbook and various forms indicate that the member must make a final election on a signed form before the election takes effect. The interpretation is also consistent with the Regents' understandable intent to provide certainty that a member's earned benefits will not be improperly diverted to an unintended third party and the Regents' desire to "hold someone accountable for the accuracy of the information," particularly because changes can be made until the time the final form is signed.

### 2. *Substantial Compliance Doctrine*

Our agreement with the Regents regarding the literal meaning of Rule 12.03 does not end the analysis. The courts have long held that the substantial compliance doctrine applies to excuse strict compliance with requirements pertaining to beneficiary designations for public employee pensions. (*Watenpaugh v. State Teachers' Retirement* (1959) 51 Cal.2d 675, 681-682 (*Watenpaugh*); see *Coughlin v. Board of Administration* (1984) 152 Cal.App.3d 70, 72-75 (*Coughlin*); *Wicktor v. County of Los Angeles* (1960) 177

Cal.App.2d 390, 394, 397-407 (*Wicktor*)*; Lyles v. Teachers Retirement Board* (1963) 219 Cal.App.2d 523 (*Lyles*).)[8]

This rule was first articulated in *Watenpaugh*, where a teacher had filed a pension beneficiary designation naming his former wife. (*Watenpaugh*, *supra*, 51 Cal.2d at p. 677.) About 11 years later he married the plaintiff, and filled out and signed a new form naming her as his beneficiary. (*Id.* at pp. 677-678.) However, he did not file the form with the retirement system and instead kept it at home. (*Id.* at p. 678.) After he died, the plaintiff discovered the form, and gave to it an attorney who filed it with the retirement system. (*Ibid.*) The plaintiff's stepchildren argued the form was ineffective because the teacher did not comply with the rule that a member who wishes to change or nominate a beneficiary must do so " 'by a written instrument duly executed *and filed with the board.*' " (*Id.* at p. 680, italics added.)

The California Supreme Court recognized that the teacher did not strictly comply with the filing rule, but also noted that the governing statutes did not "expressly preclude a filing of the designation form after the member's death . . . ." (*Watenpaugh, supra,* 51 Cal.2d at pp. 680-681.) The court additionally held that even assuming the teacher was required to file the beneficiary change form before his death, he substantially complied with this requirement by manifesting his intent to change the beneficiary *and*

---

[8] Although Manderson-Saleh did not explicitly raise the substantial compliance doctrine in her appellate briefs, we provided the parties the opportunity to address this issue in supplemental briefing. Because the doctrine raises a purely legal issue in this case (whether the Regents applied applicable law), we can properly consider the issue on appeal after considering the parties' supplemental briefing.

taking steps to do so, and such substantial compliance should be given effect. (*Id.* at pp. 681-682.) The court reasoned:

> "The purpose of the provisions requiring the filing of a change of beneficiary is largely to protect the retirement system against the possibility of being called upon to pay twice. A second purpose, no doubt, is to provide a method of ascertaining the desire and intent of the member with reference to the payment of death benefits. *The statute should be construed to give effect to an executed designation when there is a clear manifestation of intent by the member to make the change and the designation is filed promptly after death so as to prevent any prejudice to the retirement system.*
>
> "Our interpretation is in accord with the decisions involving War Risk or National Service Life Insurance issued to men in military service, where the purpose of the provisions of the statutes and regulations requiring the filing of a change of beneficiary is also largely to protect the government against being called upon to pay twice. [Citation.] It has been held that literal compliance with such regulations is not necessary to obtain a change of beneficiary where it is established that there was an intention to change and there was some affirmative action evidencing the exercise of the right to change. [Citations.]
>
> "It is true that in ordinary life insurance contracts the general rule is that there must be strict compliance with the method prescribed by the policy for change of beneficiary. [Citations.] *However, the provisions for death benefits under retirement systems differ in important respects from ordinary life insurance policies.* For example, the retirement benefits are completely statutory in origin, membership in the retirement system is compulsory, and the requirements for change of beneficiary are not subject to negotiation. The cases dealing with ordinary life insurance contracts are therefore not controlling." (*Id.* at p. 681, italics added.)

One year later, a Court of Appeal applied *Watenpaugh*'s substantial compliance rule to uphold a public employee's beneficiary designation even though the required written designation form was never received by the retirement system. (*Wicktor, supra,* 177 Cal.App.2d at pp. 394, 397-407.) In that case, the employee (a member of a county retirement system) had originally designated his sister as beneficiary. (*Id.* at pp. 393, 401-402.) He then married and informed his wife he intended to make her the beneficiary, and told others he had prepared, signed, and mailed a card to the retirement system office. (*Id.* at pp. 393-394, 401-404.) However, that card never reached the office, or the office lost or misplaced it.

Relying on *Watenpaugh*'s reasoning that substantial compliance is sufficient for a beneficiary designation where "it is established that there was an intention to change and there was some affirmative action evidencing the exercise of the right to change," the *Wicktor* court found these elements were met. (*Wicktor, supra,* 177 Cal.App.2d at pp. 397-398.) The court noted the evidence "abundantly established the existence of an intention of Dr. Wicktor to make his wife the beneficiary of his retirement death benefit," and he took steps to do so, and there was no possibility the retirement system would be "called upon to pay twice," particularly because the sister had acknowledged her husband's widow as the rightful beneficiary. (*Id.* at p. 404; see also *Lyles, supra,* 219 Cal.App.2d at p. 530 [holding teacher who made her beneficiary designation known through a statement in her will (not filed with the retirement system before her death) sufficiently complied with the retirement system's notice requirements[9]].)

___

[9] The *Lyles* court also held the retirement system's rule that beneficiary designations must be received before the member's death was invalid because it went beyond the governing law in the Education Code. (*Lyles, supra,* 219 Cal.App.2d at p. 530.)

In *Coughlin,* the court applied the *Watenpaugh* substantial compliance rule in a slightly different setting, but its observations are instructive. (*Coughlin*, *supra*, 152 Cal.App.3d 70.) During divorce proceedings (but before the divorce was final), a husband (a state employee) filed with the state retirement system (PERS) his designation of his mother as beneficiary of his pension death benefits. (*Id*. at p. 71.) The governing statutes automatically revoked all beneficiary designations upon a final divorce. (*Id*. at p. 72.) When the husband died after the final divorce, the question was whether his mother was entitled to prevail on her claim that she was the intended beneficiary, despite the statutory beneficiary revocation. Over PERS's objection, the trial court declined to apply the governing statute, finding it went against the clear manifestation of the husband's intent to benefit his mother. (*Id.* at pp. 72-75.)

Relying on *Watenpaugh*, the Court of Appeal affirmed, reasoning that the statute—which was intended to protect the inattentive employee after a divorce—should be liberally construed to give effect to the husband's intent. (*Coughlin*, *supra*, 152 Cal.App.3d at pp. 72-75.) The court explained that *Watenpaugh* and *Wicktor* reflect a "rule of liberal construction to excuse strict compliance" with statutes pertaining to pension beneficiary designation filing requirements, and rejected PERS's argument that the statutes must be strictly applied because one purpose of the enactments "was to provide certainty for the identity of beneficiaries." (*Coughlin*, at pp. 73, 74.) PERS argued that the statutes revoking all prior designations "were designed to avoid judicial inquiries into the intent of employees upon changes in their family composition," and maintained that "the legislative desire for certainty will be subverted if [the court] hold[s] employees to anything less than strict compliance with the [statutory] filing provisions." (*Id.* at p. 74.) The

32

*Coughlin* court found these arguments unavailing, noting there was no showing the Legislature intended to abrogate the *Watenpaugh* rule. (*Ibid.*) The court observed that the husband "manifested a clear intention to name a beneficiary of his own choosing in response to his change of family composition . . . . We think his situation is entirely analogous to that in *Watenpaugh* and *Wicktor*, where the employees' intents were clear, they substantially complied with the filing provisions, and their only fault was to fail to actually file the designations they had executed. . . . Under these circumstances, *Watenpaugh* mandates that his designation of [the mother] be given effect." (*Id.* at p. 75.) The court also noted that "no prejudice to PERS will be suffered by this result. [The mother] disputed the initial PERS determination before any benefits were paid out. Thus PERS was not placed in the position of having to pay twice, a position which, PERS contends and we agree, should be avoided." (*Ibid.*)

In several other decisions, the courts recognized the *Watenpaugh* substantial compliance rule but declined to apply it where there was insufficient evidence that the public employee had intended to name a particular beneficiary for his pension *and* had taken steps to do so. (See, e.g., *Hudson v. Posey* (1967) 255 Cal.App.2d 89, 91-95 [finding an oral statement of future intent insufficient]; *Gallaher v. State Teachers' Retirement System* (1965) 237 Cal.App.2d 510, 517-519 [no steps taken to effectuate intent]; see also *BankAmerica Pension Plan v. McMath* (9th Cir. 2000) 206 F.3d 821, 830-831 [recognizing *Watenpaugh*'s substantial compliance rule applicable to pension plans, but finding 401(k) plan at issue more closely resembled life insurance rather than a pension plan].)

The *Watenpaugh* rule is consistent with the more generally applied substantial compliance doctrine which is "commonly understood to mean

33

'compliance with the substantial or essential requirements of something (as a statute or contract) that satisfies its purpose or objective even though its formal requirements are not complied with.' " (*In re A.V.* (2017) 11 Cal.App.5th 697, 709.) " 'Where there is compliance as to all matters of substance[,] technical deviations are not to be given the stature of noncompliance. [Citation.] Substance prevails over form.' " (*St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 779; accord *San Diegans for Open Government v. City of Oceanside* (2016) 4 Cal.App.5th 637, 647 (*San Diegans*).)

In this case as in *Watenpaugh, Wicktor, Lyles, and Coughlin,* it is undisputed Mother intended to name her daughter as her contingent beneficiary, and she made this intent known to the Regents in writing before her death by her daughter faxing the information on the Election Worksheet form on September 13. The Regents admitted receiving this information and specifically included this beneficiary designation on the forms mailed to Mother two or three days later on September 16. Although the September 13 information was provided by Manderson-Saleh (because Mother had become incapacitated by that time), the Regents do not challenge that Manderson-Saleh had a valid power of attorney to act on Mother's behalf and that Manderson-Saleh's actions would have been binding if she had signed and returned the form on or before September 20.

These facts (which are undisputed) show that Mother (who was unmarried) had the clear intent to name her only child as her contingent annuitant and took specific affirmative steps to accomplish this result. As in *Wicktor*, there were no facts showing a possibility of a contrary claim or the potential for double payment or that Mother would change her mind before her death. Further, while Mother could have been more diligent by starting

34

the retirement and election process earlier, her failure to do so was not a complete bar to the substantial compliance rule under the circumstances. (See *Watenpaugh*, *supra*, 51 Cal.2d at pp. 681-682.) Additionally, the Service Center bore some responsibility as it was aware time was of the essence but nonetheless mailed the crucial document on September 16 (rather than emailing it on the secure email that had been established). The totality of these facts and circumstances trigger the application of the substantial compliance doctrine under *Watenpaugh*.

This case presents an even stronger case for application of the substantial compliance rule than in *Watenpaugh, Wicktor, and Coughlin* because the Regents' strict enforcement of the rule would mean Mother's earned pension benefits would result in a complete forfeiture (rather than having the benefits be given to a different claimed beneficiary). Such forfeiture would undermine the strong public policies in favor of recognizing an employee's pension rights and rights to name a contingent annuitant beneficiary. (See *O'Dea v. Cook* (1917) 176 Cal. 659, 662 (*O'Dea*) ["firmly established principle of judicial construction that pension statutes serving a beneficial purpose are to be liberally construed"]; *Frazier v. Tulare County Bd. of Retirement* (1974) 42 Cal.App.3d 1046, 1049 (*Frazier*) ["[P]ension benefits which accrue to a third party upon the death of a public employee constitute an integral part of the employee's compensation for services rendered."].) The right to designate a beneficiary in the event of an employee's death can be as important to the employee, if not more important, than the right to receive retirement benefits during the employee's lifetime. (*Frazier,* at p. 1051.)

In its supplemental briefing, the Regents argues the *Watenpaugh* and *Wicktor* decisions are distinguishable because in those cases "the courts found

35

evidence in the record of the decedent's intent to change beneficiaries prior to death." However, in this case, Mother's intent was similarly clear. The Regents does not challenge that Mother was essentially incapacitated with terminal cancer by the time she officially retired and at this time Manderson-Saleh had the full authority to act on Mother's behalf (through the notarized power of attorney), including to designate the contingent beneficiary. Manderson-Saleh did so in the Election Worksheet that the Regents admit receiving six days before Mother's death. On this record, this case is virtually identical to *Watenpaugh* and *Wicktor* with respect to the decedent's manifested intent to designate the person claiming beneficiary status through the substantial compliance doctrine.

The Regents alternatively argues the substantial compliance doctrine cannot as a matter of law apply here because (1) its regulations have the "force and effect of a statute"; and (2) the substantial compliance doctrine does not apply when a "statute's requirements are mandatory, instead of merely directory." These arguments are unavailing.

First, we agree that policies established by the Regents " 'enjoy a status equivalent to that of state statutes.' " (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320.) But the substantial compliance doctrine can apply to statutes, as well as other mandates. (See *San Diegans, supra,* 4 Cal.App.5th at p. 647 [" ' "Unless the intent of a statute can only be served by demanding strict compliance with its terms, substantial compliance is the governing test." ' "].) Additionally, although we must substantially defer to the Regents' determinations, the courts have long held these determinations remain subject to judicial review for legal correctness and to ensure discretion is exercised within permissible bounds. (See *Do, supra,* 216 Cal.App.4th at p. 1488.)

36

Second, with respect to the mandatory versus directory distinction, this rule does not preclude the substantial compliance doctrine here. Generally, the "substantial compliance [doctrine] does not apply at all when a statute's requirements are mandatory, instead of merely directory." (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1333, italics omitted.) But the distinction between mandatory and directory does not depend on the literal wording of the statute. Instead, "[t]he paramount consideration is the objective of the statute." (*Downtown Palo Alto Com. for Fair Assessment v. City Council* (1986) 180 Cal.App.3d 384, 394.) Thus, even when a statute uses "mandatory" terms, substantial compliance with statutory directives will suffice if the purpose of the statute is satisfied. (*Id.* at p. 395; accord *People v. McGee* (1977) 19 Cal.3d 948, 959; *Cal-Air Conditioning, Inc. v. Auburn Union School Dist.* (1993) 21 Cal.App.4th 655, 670 (*Cal-Air*); see *Robertson v. Health Net of California* (2005) 132 Cal.App.4th 1419, 1430.)

Under these principles, in evaluating whether a statutory mandate is to be accorded mandatory or directory effect, courts focus on its purpose or function. (*Cal-Air, supra,* 21 Cal.App.4th at p. 673.) If the element is essential to promote the statutory design, it is "mandatory" and less than full compliance is not acceptable. (*Ibid.*) If not, it is "directory." (*Ibid.*) "If a statutory directive does not go to ' "the essence" of the particular object sought to be obtained, or the purpose to be accomplished' and a 'departure from the statute will cause no injury to any person affected by it,' the provision will be deemed directory." (*Ibid.*)

In this case, a core purpose underlying Plan Regulation 12.03's requirement of a signed UBEN 161 Election form received before death is to ensure the employee's final intent is realized as to his or her desired beneficiary. This purpose is achieved by enforcing an employee's beneficiary

designation communicated to the Service Center in an equivalent written form before the employee's death, under circumstances (as here) where there is no dispute that the written designation reflected the employee's final intent. In both scenarios, the employee's actual communicated intent is enforced.

The Regents argues that the other important administrative policies underlying Plan Regulation 12.03 (ensuring "consistent" treatment of all employees, creating clear rules to avoid disputes among potential beneficiaries, and reducing the possibility that it will be subject to multiple claims) would be undermined by permitting less than strict compliance with Plan Regulation 12.03, and thus the UBEN 161 Election form rule is mandatory rather than directory. However, the *Watenpaugh* and *Coughlin* courts rejected similar arguments, holding that administrative reasons underlying the strict rule do not take precedence over the employee's earned right to designate a beneficiary where, as here, the employee's intent was clear and the employee affirmatively took all reasonable steps to do so. (*Watenpaugh, supra*, 51 Cal.2d at pp. 680-682; *Coughlin, supra,* 152 Cal.App.3d at pp. 74-75.) This is particularly true in this case in which strict enforcement of the rule would result in a complete forfeiture. (See *Irwin v. Irwin* (1977) 69 Cal.App.3d 317, 322 ["it is basic that the law abhors forfeitures and that statutes or rules must be . . . construed to avoid them whenever possible"]; see also *O'Dea, supra,* 176 Cal. at p. 662.)

The Regents argues that "[i]f the Court were to apply substantial compliance here, anyone could claim an entitlement to a deceased relative's benefits without having any evidence of the decedent's intent to elect a beneficiary." This is obviously incorrect. The Regents received *written information before Mother's death* of her intent to name her only daughter as

38

beneficiary. Her intent was known, despite the absence of a signature on the UBEN 161 Election final form. In the scenario envisioned by the Regents—where a relative seeks to claim beneficiary status "without having any evidence of the decedent's intent" or even with only equivocal evidence of the decedent's intent—there would be no substantial compliance with the governing regulations because the core purpose of the procedural rule would be defeated.

We find unhelpful the Regents' heavy reliance on *City of Long Beach v. Allen* (1956) 143 Cal.App.2d 41. There, an ordinance provided that the children of a law enforcement officer who died were entitled to a pension benefit based on *his service time.* (*Id.* at pp. 42-43.) The trial court nonetheless found the children were entitled to a higher benefit because he had been only five days short of the higher benefit level. (*Id.* at p. 43.) The Court of Appeal reversed, holding the substantial compliance doctrine was inapplicable to *increase* the monthly benefit. (*Id.* at pp. 43-46.) The court reasoned that the children were entitled only to the pension benefit to which their father was entitled when he died. (*Ibid.*) The court emphasized the "provisions of the salary ordinance are clear and no question of forfeiture is involved. The children have been receiving a pension based on [their father's correct] salary scale for a number of years." (*Id.* at pp. 44-45.)

This case is different. The issue is not whether Manderson-Saleh is entitled to something more than the applicable regulation permits. Rather, she is seeking to enforce her Mother's clear intent to name her as a beneficiary to receive her deferred compensation monthly benefits, despite that the administrative rules were not strictly followed.

*People v. Toluca Lake Collective, Inc.* (2017) 15 Cal.App.5th Supp. 18, cited by the Regents, is likewise inapposite. In that case, the appellate

39

division of a superior court declined to recognize substantial compliance in a case involving a misdemeanor complaint against a medical marijuana business that did not obey an ordinance requiring that it register with the City Clerk in order to retain immunity from prosecution as an illegal business. (*Id.* at pp. 25-28.) The obligations of a marijuana dispensary are very different from the issues presented here involving an identified beneficiary of a public pension.

Finally, we find untenable the Regents' argument that Manderson-Saleh's claim fails because she did not meet the second condition in Plan Regulation 12.03 requiring that the beneficiary designation be "subsequently approved as complete by the Plan Administrator." Interpreting this condition to mean the Regents has unfettered discretion to decide whether to approve a beneficiary designation "as complete" is not reasonable. If, as here, a claimant proves substantial compliance with the beneficiary-designation regulation, the Regents cannot reject the designation without a valid reason. None appears on the record before us.

### D. *Remedy*

We have concluded the Regents erred in failing to apply the substantial compliance doctrine in considering Manderson-Saleh's beneficiary claim. The issue then is the appropriate remedy. Manderson-Saleh argues the substantial compliance doctrine is generally a question of law and thus a rehearing is not necessary. (See *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 980; *Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 298.) The Regents counter that we should remand the matter for the Regents to rehear and reconsider the matter because a factfinder must resolve any

underlying factual disputes before the substantial compliance doctrine can be applied.

We agree a factfinder generally must resolve any disputed factual issues. But in this case there are no factual disputes relevant to the substantial compliance doctrine. Specifically, it is undisputed Mother signed a notarized power of attorney on August 25, 2016; the Regents received this power of attorney on or about this date; the Regents recognized this power of attorney was valid and that it provided Manderson-Saleh with the authority to act on Mother's behalf, including with respect to all retirement and pension decisions; by September 14, 2016 the Regents received Mother's Election Worksheet identifying Manderson-Saleh as the contingent annuitant beneficiary with her birthdate and social security number; the Regents completed a final UBEN 161 Election form based on this worksheet and specifically identified Manderson-Saleh as the contingent annuitant beneficiary with her birthdate and social security number; the Regents mailed (rather than emailed) this final form to Mother on September 16, 2016 knowing that Mother was close to her death and on life support.

Based on this record, Manderson-Saleh satisfied the substantial compliance doctrine and there are no relevant factual disputes on this issue. Thus, there is no legal basis for the Regents to conduct a new hearing on Manderson-Saleh's contingent-annuity claim. We shall therefore remand the case to the superior court with directions to grant Manderson-Saleh's writ of mandate petition and remand the matter to the Regents with directions that the Regents grant Manderson-Saleh's contingent-annuitant claim under the substantial compliance doctrine.

## II. *Breach of Contract Cause of Action*

### A. *Demurrer Standards*

" 'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' " (*Robertson v. Saadat* (2020) 48 Cal.App.5th 630, 639.) "We 'adopt[ ] a liberal construction of the pleading and draw[ ] all reasonable inferences in favor of the asserted claims.' [Citation.] We are not bound by the trial court's reasoning and may affirm the judgment if correct on any theory." (*Ibid.*) "We review the trial court's refusal to grant leave to amend under the abuse of discretion standard." (*Villafana v. County of San Diego* (2020) 57 Cal.App.5th 1012, 1017.)

### B. *Analysis*

The court properly sustained the demurrer without leave to amend on the breach of contract action because the writ of mandate petition, and not a breach of contract cause of action, is the proper vehicle for challenging the Regents' refusal to recognize Manderson-Saleh as Mother's contingent annuitant. (*Bunnett, supra,* 35 Cal.App.4th at pp. 847-848; see *Professional Engineers in California Government v. Brown* (2014) 229 Cal.App.4th 861, 875-876; *DeCuir v. County of Los Angeles* (1998) 64 Cal.App.4th 75, 80-84; Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2020) ¶13:412 ["Mandamus is the correct remedy when the employee seeks to enforce a statutory right . . . to secure pension or other statutory benefits].)"

Manderson-Saleh argues she was entitled to bring a contract cause of action because statutory grants of pension rights produce vested contract rights. The Regents disagrees, stating that public employment is governed by statute "and not by contract," and therefore Manderson-Saleh "cannot state a contract claim to . . . [M]other's pension benefits."

42

"A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment." (*Betts* v. *Board of Administration of Public Employees' Retirement System* (1978) 21 Cal.3d 859, 863 (*Betts*); *Dickey v. Retirement Board of San Francisco* (1976) 16 Cal.3d 745, 748-749; *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 506 (*Cory*).) "[T]he receipt of pension benefits is granted constitutional protection because the benefits constitute a portion of the compensation awarded by the government to its employees, paid not at the time the services are performed but at a later time," e.g. as deferred compensation. (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 985 (*Cal Fire*) [recognizing principle but finding right at issue did not concern constitutionally protected deferred compensation]; see *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1077.)

The Regents argues that even if "[Mother] may have earned some vested rights in her pension based on her own employment . . . , [Manderson-Saleh] never earned those benefits" and therefore she "was not vested in any 'right' under any 'contract.' " Manderson-Saleh counters that the vested-contractual rights principle applies when a beneficiary challenges a pension system's denial of benefits. (See, e.g., *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 31 (*Strumsky*); *Frazier, supra,* 42 Cal.App.3d at p. 1049.)

We need not resolve this dispute because even if we agree that Manderson-Saleh has some form of vested right (which we do not decide), it does not follow she has a right to challenge a denial of benefits through a common law claim for damages. The decisions relied upon by Manderson-

43

Saleh in support of this proposition each arose in the context of a writ of mandate petition. (See e.g., *Betts, supra,* 21 Cal.3d at p. 863; *Strumsky*, *supra*, 11 Cal.3d at p. 31; *Cory, supra,* 155 Cal.App.3d at pp. 505-506; see also *Cal Fire*, *supra*, 6 Cal.5th 965 [mandamus action brought to challenge elimination of claimed vested contract right].) Manderson-Saleh does not cite any relevant authority supporting that an employee can properly bring a contract claim in lieu of a writ of mandate petition in challenging a denial of pension benefits.

Additionally, even if such a claim could be brought for damages, generally the judicial exhaustion doctrine would bar that claim. Under this doctrine, a party is barred from contradicting a fact found by an administrative tribunal unless it has first successfully challenged the administrative determination by a writ of mandamus (under sections 1085 or 1094.5, whichever is appropriate under the particular circumstances). (See *Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 867.) "Unless the administrative decision is [successfully] challenged, it binds the parties on the issues litigated and if those issues are fatal to a civil suit, the plaintiff cannot state a viable cause of action." (*Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 243.)

Although there are exceptions to this doctrine, Manderson-Saleh has not raised any such exception in her appellate briefing, and therefore she has forfeited any such argument on appeal.

As to Manderson-Saleh's contention the court erred in denying her the opportunity to amend her complaint to assert equitable estoppel and breach of fiduciary duty claims, Manderson-Saleh has not met her burden to show she can amend her complaint to state a viable claim. Manderson-Saleh's

44

fiduciary duty and equitable claims are deficient on the same basis that her contract claim fails. Her proper remedy was through a mandate petition.

## DISPOSITION

We affirm the portion of the judgment sustaining the demurrer without leave to amend on the contract claim. We reverse the portion of the judgment denying Manderson-Saleh's petition for writ of mandate.

We remand the matter to the superior court with directions to (1) vacate its order denying Manderson-Saleh's mandate petition; and (2) issue a new order and judgment granting the petition and issuing a writ directing the Regents to grant Manderson-Saleh's contingent-annuitant claim under the substantial compliance doctrine.

Regents to bear Manderson-Saleh's costs on appeal.


                                                    HALLER, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

45